**UNITED STATES of America,
Appellee,**

**v.**

**Shlomo COHEN, Defendant–Appellant,**

**Eliase Shtoukhamer, Defendant.**

**Docket No. 04–0983–CR.**

United States Court of Appeals,
Second Circuit.

Argued: Sept. 14, 2005.

Decided: Oct. 20, 2005.

Arthur Joel Berger (Joel D. Robrish, Law Office of Joel D. Robrish, of counsel), Miami, FL, for Defendant–Appellant.

Benjamin Lawsky, Assistant United States Attorney (Jeffrey A. Udell and Peter G. Neiman, Assistant United States Attorneys, of counsel; David N. Kelley, United States Attorney for the Southern District of New York, on the brief), United States Attorney's Office for the Southern District of New York, New York, NY, for Appellee.

Before: MESKILL and CABRANES, Circuit Judges, and NEVAS, District Judge.*

JOSÉ A. CABRANES, Circuit Judge.

Following a jury trial in the United States District Court for the Southern District of New York (George B. Daniels, *Judge* ), defendant Shlomo Cohen was convicted on two counts of conspiring to distribute and import pills containing a detectable amount of 3, 4–methylenedioxy-methamphetamine, the drug commonly known as "ecstasy," in violation of 21 U.S.C. § 846 and 21 U.S.C. § 963. On February 11, 2004, the District Court sentenced defendant principally to 72 months' imprisonment and three years' supervised release. On appeal, defendant challenges his conviction and sentence on the grounds that (1) he received ineffective assistance of counsel; (2) part of the District Court's jury charge constituted plain error; and (3) he is entitled to a remand to permit the District Court to decide whether to resentence him pursuant to *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005). For the following reasons, we affirm the judgment of conviction and remand to the District Court to consider whether to resentence defendant.

## BACKGROUND

In the summer of 2000, Nadav Dagan ("Dagan"), a one-time ecstasy dealer turned government cooperator, contacted an individual named Eliase ("Eli") Shtoukhamer ("Shtoukhamer"), with whom Dagan previously had conducted ecstasy deals, to learn about "what was going on" in the business. On August 24, 2000, in a meeting recorded on audiotape by the Drug Enforcement Agency ("DEA"),

Shtoukhamer told Dagan that he and a man identified as "Shlomo" (*i.e.*, defendant Shlomo Cohen) were planning to smuggle 30,000 ecstasy pills from Belgium into the United States by commercial airplane. Speaking in Hebrew, Shtoukhamer referred to the pills as "wheels" and asked Dagan to provide a "mare," or female drug courier, to help smuggle the pills on a flight in which the courier would be joined, without her direct knowledge, by both Shtoukhamer and his "partner." Under the proposed transaction, the courier would receive $15,000 for her efforts, "Shlomo" would invest in 20,000 of the pills for resale, and Dagan would invest in the remaining 10,000 pills at a cost of $1.50 each, or $15,000.

Thereafter, Dagan, Shtoukhamer, and Cohen met on three occasions, all recorded and observed by law enforcement, in which they negotiated the terms of the smuggling operation and discussed the possible distribution of the pills in the United States. At these meetings, Cohen stated that the pills would come "packaged as a gift" in the courier's suitcase, and he actively discussed issues such as the costs and timing of the deal, the status of preparations in Belgium, and the need for Dagan to provide a courier. After subsequent changes in the deal allowing Dagan to distribute 10,000 pills in the United States on a consignment basis, and additional videotaped meetings, Shtoukhamer gave Dagan $1900 to pay for the courier's airplane ticket. A few weeks later, however, Shtoukhamer and Cohen, who had learned of a "big bust" in Belgium, called the deal off for fear of getting caught. On November 14, 2000, after Cohen had spoken separately with Dagan and Shtouk-

---

* The Honorable Alan H. Nevas, United States District Judge for the District of Connecticut, sitting by designation.

hamer by telephone, Dagan returned the $1900 to Shtoukhamer.

In November 2001, Cohen was arrested by the DEA and subsequently charged with (1) conspiracy to distribute and possess with intent to distribute approximately 30,000 ecstasy pills in violation of 21 U.S.C. § 846; (2) conspiracy to import ecstasy into the United States in violation of 21 U.S.C. § 963; and (3) possessing ecstasy with intent to distribute in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C). Shtoukhamer, who had been charged with one count of conspiracy to distribute ecstasy, pleaded guilty in May 2002 and was sentenced principally to 46 months' imprisonment by the District Court. Cohen then proceeded to a trial by jury, which convicted him of both conspiracy charges under Counts One and Two but acquitted him on the substantive offense of possession with intent to distribute under Count Three. On February 11, 2004, the District Court sentenced Cohen to two concurrent terms of 72 months' imprisonment, followed by three years' supervised release. This appeal followed.

## DISCUSSION

On appeal, Cohen contends that his conspiracy convictions were the result of ineffective assistance of counsel because his trial counsel failed to object to (1) the Government's argument in summation that Cohen's co-conspirators may have included, in addition to Shtoukhamer, "other [unnamed] people overseas"; and (2) the District Court's charge instructing the jury to determine whether Cohen had conspired with "Eli Shtoukhamer and/or others who were not acting as agents of law enforcement." We consider each claim in turn.

### I. Ineffective Assistance of Counsel

■ We may review a claim of ineffective assistance of counsel on direct appeal where, as here, "the factual record is fully developed and resolution of the Sixth Amendment claim on direct appeal is beyond any doubt or in the interest of justice." *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir.2004) (internal quotation marks omitted). A defendant claiming ineffective assistance must (1) demonstrate that his counsel's performance "fell below an objective standard of reasonableness" in light of "prevailing professional norms," *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); and (2) "affirmatively prove prejudice" arising from counsel's allegedly deficient representation, *id.* at 693, 104 S.Ct. 2052. *See Gaskin*, 364 F.3d at 468 (noting that a defendant "bears a heavy burden" of showing "both (1) that counsel's performance was so unreasonable under prevailing professional norms that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment, and (2) that counsel's ineffectiveness prejudiced the defendant such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different") (internal quotation marks and citation omitted). In applying this standard, a reviewing court must make "every effort . . . to eliminate the distorting effects of hindsight" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation marks omitted). "Paramount to any [such] review . . . is 'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Gaskin*, 364 F.3d at 468 (quoting *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052).

## A. Failure to Object to Government's Summation

■ Defendant argues that he was deprived of effective assistance of counsel, first, because his trial counsel failed to object to part of the Government's argument in summation regarding the identity of defendant's alleged co-conspirator(s). Referring to Shtoukhamer, who already had pleaded guilty to conspiring to distribute ecstacy in a companion case, the Government argued to the jury:

> You have to find that the defendant conspired with at least one person other than Nadav Dagan[, a government cooperator who, by law, would not have qualified as a member of the alleged conspiracy, *see, e.g., United States v. Medina*, 32 F.3d 40, 43–45 (2d Cir. 1994) ]. Now, clearly you have Eli [Shtoukhamer] here. The defendant is conspiring or agreeing to commit these crimes with Eli. *And we submit to you there are also other people overseas, but, of course, we don't know what their names are, who they are.* But at the very least you have the defendant conspiring or agreeing with Eli to commit the crimes charged in the indictment.

Trial Tr. 844 (emphasis added).

Defendant contends that his counsel's failure to object to the italicized statement above, and to request a curative instruction in response, constituted ineffective assistance because "[o]n the only facts elicited at this trial, there was no legal basis for the jury to convict [defendant] of conspiring with anyone in Belgium ... to import Ecstasy pills into the United States, let alone to possess those pills in the United States with intent to distribute those pills in the United States." Appellant's Br. 19. In support of the assertion that there was no "legal basis" for his conspiracy convictions, defendant argues that (1) there "may" be "Due Process Clause, other Constitutional, or international law limitations on what Congress can make a crime regarding conduct outside the territorial jurisdiction of the United States," *id.* at 19 n. 17; and (2) even assuming jurisdiction was appropriate in this case, "there was no evidence that anyone in Belgium had any intent to be involved, let alone have a stake, in" the charged distribution and importation scheme, *id.* at 20.

Defendant's arguments fail for several reasons. First, we are aware of no principle, and none has been brought to our attention, that supports defendant's casual invocation of constitutional or "international law limitations" on the extraterritorial application of federal laws designed to combat the distribution and importation of drugs into the United States. *See United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) (emphasizing that "in fashioning the reach of our criminal law, Congress is not bound by international law" and that "[i]f it chooses to do so, [Congress] may legislate with respect to conduct outside the United States, *in excess of* the limits posed by international law") (emphasis added) (internal quotation marks omitted); *see also id.* at 92 ("[W]hile customary international law may inform the judgment of our courts in an appropriate case, it cannot alter or constrain the making of law by the political branches of the government as ordained by the Constitution."); *cf. United States v. Gatlin*, 216 F.3d 207, 211 n. 5 (2d Cir.2000) (noting that, due to the nature of the offenses involved, "[s]tatutes prohibiting crimes *against the United States government* may be applied extraterritorially even in the absence of 'clear evidence' that Congress so intended").

Indeed, of those courts that have directly considered the extraterritorial application of either 21 U.S.C. § 846 or § 963—the statutory bases for the conspiracy counts at issue here—each has rebuffed

attempts to limit the territorial reach of these provisions. *See United States v. MacAllister*, 160 F.3d 1304, 1308 (11th Cir. 1998) ("Logic dictates that Congress would not have passed a drug conspiracy statute that prohibits international drug smuggling activities, while simultaneously undermining the statute by limiting its extraterritorial application."); *United States v. Palella*, 846 F.2d 977, 980 (5th Cir.1988) ("The power to control efforts to introduce illicit drugs into the United States from the high seas and foreign nations is a necessary incident to Congress' efforts to eradicate all illegal drug trafficking.") (internal quotation marks omitted); *United States v. Wright–Barker*, 784 F.2d 161, 167 (3d Cir.1986) ("Congress undoubtedly intended to prohibit conspiracies to import controlled substances into the United States, and intentions to distribute such contraband there, as part of its continuing effort to contain the evils caused on American soil by foreign as well as domestic suppliers of illegal narcotics."); *Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir.1984) (stating that "[t]here is no constitutional bar to the extraterritorial application of penal laws" and that "[t]his court . . . has regularly inferred extraterritorial reach of conspiracy statutes on the basis of a finding that the underlying substantive statutes reach extraterritorial offenses"); *see also United States v. Orozco–Prada*, 732 F.2d 1076, 1087–88 (2d Cir. 1984) (conspiracy conviction under 21 U.S.C. § 846 proper where evidence showed intent to distribute drugs in the United States, even though vessel was captured in Colombian waters); *cf. Yousef*, 327 F.3d at 87 ("Congress is presumed to intend extraterritorial application of criminal statutes where the nature of the crime does not depend on the locality of the defendants' acts and where restricting the statute to United States territory would severely diminish the statute's effectiveness."). Accordingly, we reject defendant's implied argument that 21 U.S.C. §§ 846 and 963 may not be applied extraterritorially.

Defendant maintains in the alternative that even if §§ 846 and 963 reach acts committed abroad, the evidence presented at trial did not support the Government's suggestion that "other people overseas" had in fact conspired with defendant to distribute and import ecstasy pills into the United States. This argument, however, is based on a fundamental misreading of the Government's summation. As is apparent from the full context of the Government's remarks quoted above, the Government did not rest its case principally on a theory that defendant had conspired with unnamed individuals in Belgium. Rather, the Government emphasized defendant's relationship with Eli Shtoukhamer, of which there was direct and overwhelming evidence in the form of recorded conversations about drug dealing,[1] arguing that "at the very least" defendant had conspired with Shtoukhamer, independent of any implied conspiracy with "other people over-

---

**1.** Defendant met three times with Dagan and Shtoukhamer to negotiate the terms of the smuggling operation, actively discussing issues such as the costs of the proposed deal, Gov't Trial Ex. 6T at 14 ("And a five . . . is expenses . . . ."); the timing of the operation, *id.* at 24 ("As far as I'm concerned, the sooner the better . . . . Try . . . to arrange this, like towards Monday, Tuesday."); the obligations of the courier, *id.* at 23 ("[S]he comes, they give her, they take, they say hello and good-bye. . . . She arrives, she finishes the job, it's correct, she receives whatever is due her, goodbye."); and the status of the preparations in Belgium, Gov't Trial Ex. 8T at 9 ("Over there everything is ready. One only needs to come and take it."). In addition, after the deal was called off, Cohen was recorded on a government wiretap of Shtoukhamer's phone authorizing Shtoukhamer to retrieve the money given to Dagan to pay for the courier's airplane ticket to the United States.

seas." *See* Trial Tr. 844 ("Now, clearly you have Eli [Shtoukhamer] here. The defendant is conspiring or agreeing to commit these crimes with Eli.").

Moreover, defendant's contention that there was "no evidence" supporting the involvement of any co-conspirators in Belgium is not supported by the trial record, which included the testimony of Nadav Dagan that he believed defendant was "paying somebody to watch" the drugs in Belgium, Trial Tr. 418, defendant's own recorded statement about how much the "storage" of the drugs in Belgium was "costing" him,[2] and the commonsense notion that 30,000 ecstasy pills could not have been stored, secured, and imported from a foreign country without the knowing involvement of one or more individuals abroad. *See United States v. Harris,* 8 F.3d 943, 946 (2d Cir.1993) ("[W]here advanced plans are made regarding the sale of narcotics in wholesale quantities, the participants in the transaction may be presumed to know that they are part of a broader conspiracy.") (internal quotation marks omitted); *United States v. Medina,* 944 F.2d 60, 65 (2d Cir.1991) (doctrine that mere "buyer-seller" relationship is insufficient to establish distribution conspiracy not applicable where "there is advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use"). We have noted previously that the Government "has broad latitude in the inferences it may reasonably suggest to the jury during summation," *United States v. Edwards,* 342 F.3d 168, 181 (2d Cir.2003) (internal quotation marks omitted), and the Government's comments here, while arguably imprecise, were by no means unreasonable in light of the evidence presented at trial and the nature of the charged distribution and importation scheme.

In assessing defendant's claim on appeal, we emphasize that defendant argues not that the Government's summation in itself undermined the integrity of defendant's trial or violated his rights, but rather, that trial counsel's failure to *object* to that statement constituted ineffective assistance of counsel. However, absent any prejudicial error in the Government's summation, the failure here to raise an otherwise futile objection could not have rendered counsel ineffective. *See Cuevas v. Henderson,* 801 F.2d 586, 592 (2d Cir.1986) (concluding that because "[t]he prosecutor's summation was appropriate .... defense counsel's failure to object does not support a conclusion that his performance was not reasonably competent"); *see also United States v. Eltayib,* 88 F.3d 157, 170 (2d Cir.1996) ("Given the weight of the evidence, [defendant] cannot demonstrate that his case was prejudiced by his counsel's failure to adopt what was in any event an unpromising defense strategy.")

As with trial decisions to offer or stipulate to certain evidence, decisions such as when to object and on what grounds are primarily matters of "trial strategy and tactics," *see Brown v. Artuz,* 124 F.3d 73, 77 (2d Cir.1997) (internal quotation marks omitted), and thus are "virtually unchallengeable" absent exceptional grounds for doing so. *See Gaskin,* 364 F.3d at 468 (internal quotation marks omitted); *see also United States v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998) (noting that "appel-

---

**2.** Emphasizing his need to find a courier to transport the drugs from Belgium to the United States in response to Dagan's effort to negotiate *more favorable terms under the deal,* Cohen is recorded as stating to Dagan, "We have the merchandise there, stuck.... I don't have a choice. It's already costing me storage there and its costing me everything. You understand? A dollar and [a] half, plus the shipping, plus the storages there, and all that." Gov't Trial Ex. 13T at 5, 9.

late courts are ill-suited to second-guess" strategic decisions by trial counsel "unless there is no strategic or tactical justification for the course taken"); *United States v. Daniels,* 558 F.2d 122, 127 (2d Cir.1977) ("[T]he decision whether to object to an arguably improper remark [in the Government's summation] or to wait and attack it in the defense summation [is] strictly a matter of tactics."). In seeking to meet the "heavy burden" imposed by *Strickland, see Gaskin,* 364 F.3d at 468, a defendant must not only overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, but also demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. Given that the evidence of defendant's conspiracy with Shtoukhamer was overwhelming—a point that defendant's appellate counsel effectively conceded at oral argument—we conclude that the failure of defendant's trial counsel to object to a passing and equivocal statement in summation regarding the possible involvement in the conspiracy of "other people overseas" was neither objectively unreasonable nor prejudicial to defendant's case. *See, e.g., United States v. Simmons,* 923 F.2d 934, 956 (2d Cir.1991) ("[G]iven the plethora of evidence against [defendant], there is little reason to believe that alternative counsel would have fared any better."). Accordingly, defendant's ineffective assistance claim fails.

**B. Failure to Object to Jury Instruction**

■ Defendant also contends that he received ineffective assistance when his counsel failed to object to the following instruction in the District Court's jury charge:

If you are satisfied that the conspiracy charged in the indictment existed, you must then ask yourselves who the members of that conspiracy were.... You need not determine the identity of all coconspirators. However, *you must determine whether it has been proven that the defendant was a member of a conspiracy with Eli Shtoukhamer and/or others who were not acting as agents of law enforcement.*

Trial Tr. 966 (emphasis added). Defendant argues that by mentioning Shtoukhamer in this manner, the District Court "partially direct[ed] a verdict in favor of the Government" by indicating that "the *trial judge* had determined *already* that Eli Shtoukhamer had the needed intent, desire and determination to import Ecstasy pills into the United States" and thus was "one conspirator of the two" needed for the jury to convict. Appellant's Br. 22. The plain language of the District Court's charge, however, indicates otherwise. By instructing the jury to determine whether defendant had conspired with "Eli Shtoukhamer *and/or* others," the District Court simply applied the facts of the case before it to the relevant law. *See United States v. Lung Fong Chen,* 393 F.3d 139, 153 (2d Cir.2004) ("[T]he district court has broad discretion to decide which facts, if any, it will mention in its comments to the jury" so long as the charge is "fair to both sides.") (internal quotation marks omitted); *United States v. Rahman,* 189 F.3d 88, 142 (2d Cir.1999) (no error for trial judge to refer to evidence in explaining law of entrapment). Nor did the District Court err in referring generally in its instruction to "others" who may have conspired with defendant. Just as "an individual need not know the identities of all coconspirators in order to be found guilty of being a member of the conspiracy," *see Harris,* 8 F.3d at 946, the jury need not determine the

identity of all co-conspirators in order to find that the conspiracy in fact existed.

Absent actual error in the District Court's instruction, and in light of the overwhelming evidence presented at trial that defendant had conspired with Eli Shtoukhamer to distribute and import ecstasy into the United States, trial counsel's failure to object to the jury charge did not constitute ineffective assistance of counsel. *See United States v. Frampton,* 382 F.3d 213, 222 n. 8 (2d Cir.2004) ("Having found no error in [the district court's] instruction, we hold [defendant's] claim [of ineffective assistance] must fail.").

Where a defendant fails to preserve an objection to a District Court's jury instruction, we undertake a traditional plain error review of that instruction. *See United States v. Pabon–Cruz,* 391 F.3d 86, 95–96 (2d Cir.2004). "To establish plain error, a court must find (1) an error, (2) that is plain, (3) that affects substantial rights." *United States v. Keigue,* 318 F.3d 437, 441 (2d Cir.2003) (internal quotation marks omitted); *see also United States v. Thomas,* 274 F.3d 655, 667 (2d Cir.2001) (en banc) ("[A]n error is 'plain' if it is 'so egregious and obvious' that a trial judge and prosecutor would be 'derelict' in permitting it in a trial held today.") (citation omitted). With respect to defendant's claim that the jury instruction itself constituted "plain error," it is enough to say that, for the reasons stated above, the District Court committed no error at all, much less plain error.

## II. *Crosby* **Remand**

■ Defendant also challenges his sentence on appeal. In light of the Supreme Court's decision in *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160

L.Ed.2d 621 (2005), and our decision in *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005), we remand to the District Court so that it may consider whether to resentence defendant in conformity with the currently applicable statutory requirements, as outlined in *Crosby.*

## CONCLUSION

The judgment of the District Court convicting defendant is hereby AFFIRMED. The cause is REMANDED to the District Court for consideration whether to resentence defendant in accordance with *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005).